UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THERESA CINEUS,

     Plaintiff,

v.                                Case No. 8:21-cv-1659-MSS-SPF

FLORIDA DEPARTMENT OF
CORRECTIONS, *et al.*,

     Defendants.
_____/

**O R D E R**

Cineus, on behalf of the Estate of Gamaliel Cineus, sues the Florida Department of Corrections, Centurion of Florida, LLC, and V. Gonzalez for federal civil rights violations. (Doc. 30) The Department of Corrections moves to dismiss a negligent supervision claim (Count Three) in Cineus's third amended complaint and asserts that Cineus fails to state a claim. (Doc. 31) Centurion moves to dismiss a deliberate indifference claim (Count One), asserts that medical records refute the claim, and asserts that Cineus fails to allege liability under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). (Doc. 20)

In her third amended complaint, Cineus alleges that her son, Gamaliel, suffered shortness of breath, weakness, abdominal pain, chest pain, and other health problems while he was an inmate at Polk County Correctional Institution. (Doc. 30 at 9) The Department of Corrections contracts with Centurion to provide medical care at the prison. (Doc. 30 at 3) Gamaliel requested medical care but Centurion staff at the prison refused to perform testing to determine the cause of his health problems and refused to refer him to healthcare providers outside the prison for evaluation and treatment. (Doc. 30 at 10)

1

Gamaliel told his family about his health problems and expressed concern that Centurion staff were not providing adequate care. (Doc. 30 at 10) Prison staff accused Gamaliel of feigning illness and threatened to punish him if he continued to request medical care. (Doc. 30 at 10) Cineus contacted the warden and Centurion staff at the prison about her son's health problems and informed them that Gamaliel may suffer from blood clots because she took medication to prevent blood clots and other family members suffered from blood clots. (Doc. 30 at 10) Centurion staff refused to perform testing or refer Gamaliel to a healthcare provider outside the prison. (Doc. 30 at 10)

Between May 6, 2018 and October 23, 2018, Gamaliel visited the prison clinic ten times and complained about health problems including shortness of breath, chest pain, abdominal pain, severe headaches, a bloody nose, and a small lump under his skin. (Doc. 30 at 10–12) On May 14, 2018, Centurion staff prescribed over-the-counter medication for pain from the small round lump under his skin. (Doc. 30 at 11) On August 27, 2018, Centurion staff performed an X-ray after Gamaliel complained about pain in his rib cage and stomach. (Doc. 30 at 12) Centurion staff did not receive results from the X-ray until two months later. (Doc. 30 at 12) Otherwise, during this four-and-a-half months, Centurion staff performed no further testing and provided no further treatment.

Between October 30, 2018 and December 21, 2018, Gamaliel visited the prison clinic another seven times and complained about shortness of breath, heartburn, abdominal pain, pain under his ribs, and weakness. (Doc. 30 at 13–15) Each visit, V. Gonzalez, a nurse, attended to Gamaliel. (Doc. 30 at 13–15) On December 19, 2018, Gonzalez prescribed Gamaliel Pepcid. (Doc. 30 at 14) Otherwise, during these two months, Gonzalez performed no further testing and provided no further treatment.

On December 23, 2018, Gamaliel visited the prison clinic and complained about shortness of breath and burning in his chest. (Doc. 30 at 15) A nurse directed Gamaliel to continue taking antacids. (Doc. 30 at 15) The next day, while feeling weak, Gamaliel "blacked out" in the prison cafeteria, and two nurses examined him and only referred him to a doctor for a follow up. (Doc. 30 at 15) Two days later, Gamaliel collapsed in his prison cell. (Doc. 30 at 15) Centurion staff did not immediately summon emergency services, and Gamaliel died later that day. (Doc. 30 at 15–16) A medical examiner opined that the cause of death was a pulmonary embolism, a blood clot in the lungs. (Doc. 30 at 16)

Cineus alleges that Centurion has a persistent and widespread practice of refusing to provide constitutionally adequate medical care in prison to increase the company's profits and asserts that Centurion's practice caused Gamaliel's death. (Doc. 30 at 9) She identifies other inmates in Florida prisons who received constitutionally deficient medical care because of Centurion's cost-saving practice. (Doc. 30 at 16–18) Also, she identifies inmates in prisons in other states who received constitutionally deficient medical care because of the same cost-saving practice by subsidiaries of Centurion's parent corporation. (Doc. 30 at 4–6)

## STANDARD OF REVIEW

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

### Department of Corrections' Motion to Dismiss Negligent Supervision Claim

The Department moves to dismiss a negligent supervision claim (Count Three) and contends that Cineus fails to allege that (1) the Department had a duty to supervise Centurion's staff, that (2) the Department knew that Centurion's staff were not qualified to provide medical care, and that (3) an employee or agent of the Department acted outside the scope of his employment. (Doc. 31 at 3–4)

Even though the Department moves to dismiss the "third amended complaint," the Department cites and refers only to the amended complaint at Docket Entry 12. (Doc. 31 at 3–4) An earlier order struck Cineus's amended complaint at Docket Entry 12 because Cineus failed to move for leave to file the amended complaint. (Doc. 14) The operative complaint is Cineus's third amended complaint at Docket Entry 30. Because the Department presents argument based on citations to the earlier stricken complaint, the motion is meritless.

Even so, in the third amended complaint, Cineus alleges that the Department delegated the treatment of inmates to Centurion by contracting with Centurion to provide medical services. (Doc. 30 at 33) She contends that the Department owed a duty to all inmates, including Gamaliel, to supervise Centurion's medical services. (Doc. 30 at 33) She asserts that the Department breached that duty when she informed the warden that Gamaliel was suffering from serious medical problems and was receiving grossly inadequate medical care, and the Department did not ensure that Centurion provided Gamaliel constitutionally adequate medical care. (Doc. 30 at 10, 22, 33–34) She asserts that the Department's breach was a direct and proximate cause of Gamaliel's death. (Doc. 30 at 34–35)

"Florida follows the general rule that the employer of an independent contractor is not liable for the contractor's negligence because the employer has no control over the manner in which the work is done . . . ." *McCall v. Alabama Bruno's Inc.*, 647 So. 2d 175, 177 (Fla. 1st DCA 1994). "[I]t also recognizes exceptions to the general rule which may generally be divided into three categories: (1) negligence in selecting, instructing, or supervising the contractor; (2) non-delegable duties arising out of some relation toward the public or the particular plaintiff; and (3) work which is specially, peculiarly, or 'inherently' dangerous." *Id.*

A prisoner has an Eighth Amendment right against cruel and unusual punishment, which protects a prisoner from a prison's deliberately indifferent care to a prisoner's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). *See also West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody . . . .").

Even though a governmental entity may contract with a private company to provide inmates medical care, *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985), explains that the governmental entity retains a non-delegable duty of care:

> The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. *See Estelle*, *supra.* This duty is not absolved by contracting with an entity such as Prison Health Services. Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service. In that sense, the county's duty is non-delegable.

5

Also, under Florida law, a prisoner has a right to medical care. Fla. Admin. Code R. 33-602.101(9) ("All inmates shall be furnished proper medical care and medicine."). A prisoner may sue his jail or prison custodian if the custodian negligently selects or supervises a private medical contractor. *Darling v. Palm Beach Cty. Sheriff*, 2 So. 3d 368, 369 (Fla. 4th DCA 2008) ("[N]otwithstanding the Sheriff's purported delegation of its medical care obligations to third-party provider PHS, Darling's deposition testimony suggests that this provider was negligently selected and supervised. This assertion may also create genuine issues of fact that cannot be decided on summary judgment.") (citing *Kelley v. Rice*, 670 So. 2d 1094, 1096 (Fla. 2d DCA 1996)).

In her complaint, Cineus asserts that the Department negligently supervised Centurion, a contractor, and breached a duty of care owed to Gamaliel. (Doc. 30 at 33–35) In its motion to dismiss, the Department mischaracterizes the claim as asserting that the Department negligently supervised Centurion's employees. (Doc. 31 at 3–4) Cineus alleges that she contacted the warden to inform him that Gamaliel was suffering serious medical problems and receiving grossly inadequate medical care. (Doc. 30 at 10, 22, 34) Because, under Florida law, the Department owed a non-delegable duty of care to Gamaliel and may incur liability for negligently selecting and supervising Centurion, Cineus adequately alleges a claim against the Department. Consequently, the Department's motion to dismiss (Doc. 31) is **DENIED**.

### Centurion's Motion to Dismiss Deliberate Indifference Claim

Centurion moves to dismiss a deliberate indifference claim (Count One) and contends that medical records attached to its motion refute the deliberate indifference claim. (Doc. 32 at 13–19) "A court's review on a motion to dismiss is 'limited to the four corners of the

complaint.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citation omitted). "A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." *Id. See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Cineus does not attach the medical records to her third amended complaint. (Doc. 30) Centurion argues that the Court may still consider the medical records because "allegations [in the third amended complaint] repeatedly reference the medical records when making allegations about [Gamaliel's] care, making them central to [Cineus's] claim." (Doc. 32 at 17)

In the complaint, Cineus does refer to the medical records to identify who in the prison clinic provided treatment to Gamaliel on a particular day. (Doc. 30 at 11–15) In paragraphs 47 and 66, Cineus also refers to medical records to substantiate that medical staff "palpated a small round lump under [Gamaliel's] skin" (Doc. 30 at 11) and that Gamaliel "experienced medical distress as early as 5:00 A.M. on [the day of his death] but he was not transported until 7:53 A.M." (Doc. 30 at 15–16) Cineus does not otherwise quote or rely on the medical records to support the deliberate indifference claim against Centurion.[1]

At trial, Cineus may present testimony by witnesses, instead of introducing the medical records, to prove the deliberate indifference claim. Because Cineus may prove the deliberate indifference claim without relying on the medical records, the records are not central to the claim. *Finan. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007) ("[T]he First Circuit has held, with respect to a complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's

---

[1] Centurion cites paragraphs 138, 144, and 155 as additional examples of Cineus's reliance on the medical records in the complaint. Those paragraphs support counts against other defendants.

motion to dismiss was central to the plaintiffs' claim because '[p]laintiffs unquestionably would have had to offer a copy of the article in order to prove their case.'") (quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)); *Roberts v. Carnival Corp.*, 824 F. App'x 825, 826 (11th Cir. 2020)[2] ("The ticket contract is not central to her claims because it is not a necessary or essential part of Roberts's effort to show that she was injured due to Carnival's negligence.").

Also, in her response to the motion to dismiss, Cineus disputes facts that Centurion draws from the records. (Doc. 33 at 2–7) For example, Centurion contends (Doc. 32 at 18): "[T]here is no record [Gamaliel] complained of shortness of breath until October 30, 2018." Cineus responds (Doc. 33 at 2): "Contrary to [Centurion's] allegations in its motion to dismiss, a plethora of medical records document [Gamaliel's] shortness of breath in the spring of 2018." Centurion attaches to the motion to dismiss only an "excerpt" of the medical records. (Docs. 32 at 2 and 32-1) Cineus attaches additional records to her response. (Doc. 33) Because Centurion and Cineus dispute material facts in the records, consideration of the records at this early stage of the case is not appropriate. *See Saunders v. Duke*, 766 F.3d 1262, 1270–71 (11th Cir. 2014).

To consider the medical records, the Court would have to treat Centurion's motion to dismiss as a motion for summary judgment. Fed. R. Civ. P. 12(d). *Estate of Malkin v. Wells Fargo Bank, N.A.*, 998 F.3d 1186, 1201 (11th Cir. 2021). Because the parties have not conducted discovery, summary judgment is premature. *Smith v. Fla. Dep't Corrs.*, 713 F.3d 1059, 1064 (11th Cir. 2013). Consequently, the Court declines to treat the motion to dismiss

---

[2] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

as a summary judgment motion, and Centurion's motion (Doc. 32) to dismiss the deliberate

indifference claim as refuted by the medical records is **DENIED**.

### Centurion's Motion to Dismiss Claim Based on *Monell* Liability

Centurion asserts that Cineus fails to allege either a custom, practice, or policy to

demonstrate liability under *Monell* and fails to allege that a policymaker at Centurion ratified

a subordinate's decision to provide constitutionally deficient medical care. (Doc. 32 at 21–24)

Cineus responds that the complaint alleges that Centurion "had a custom and a practice of

denying and delaying vital medical services if it required potentially costly medical treatment

from outside medical providers." (Doc. 33 at 15)

Because the Department of Corrections contracts with Centurion to provide medical

care to inmates, Centurion "performs a function traditionally within the exclusive prerogative

of the state" and becomes the "functional equivalent" of the government entity. *Buckner v.

Toro*, 116 F.3d 450, 452 (11th Cir. 1997). Cineus must allege that a policy or custom by

Centurion was the moving force behind the constitutional violation. *Monell*, 436 U.S. at

694–95.

"A policy is a decision that is officially adopted by the municipality, or created by an

official of such rank that he or she could be said to be acting on behalf of the municipality."

*Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "A custom is a practice

that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489.

To establish a custom, "it is generally necessary to show a persistent and wide-spread

practice." *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) (quoting *Depew v.

City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "[A]ctual or constructive knowledge

of such customs must be attributed to the governing body of the municipality." *Church*, 30

F.3d at 1345. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality. A pattern of similar constitutional violations . . . is ordinarily necessary." *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citations and internal quotations omitted).

In the third amended complaint, Cineus alleges that Centurion "cared more about its financial health than it did about the health of the inmates that it contracted to provide medical care." (Doc. 30 at 24) She identifies the following "longstanding and widespread" practices by Centurion: (1) failing to transport inmates to outside medical facilities such as urgent care centers, emergency rooms, and hospitals, (2) failing to refer inmates for diagnostic and specialty medical care, and (3) failing to summon emergency medical services for inmates who need emergency care. (Doc. 30 at 21)

Cineus alleges that, between May 6, 2018 and December 24, 2018, Gamaliel went to the prison clinic managed by Centurion nineteen times and displayed symptoms of shortness of breath, stomach pain, chest pain, headaches, and weakness. (Doc. 30 at 10–15) Centurion staff did not refer Gamaliel to an outside medical provider and provided minimal evaluation and treatment. In May of 2018, when Gamaliel complained about a painful small round lump under his skin, Centurion staff prescribed him over-the-counter pain medication. (Doc. 30 at 11) In August of 2018, when Gamaliel suffered from intense pain on the side of his torso, Centurion staff ordered imaging of his chest but did not receive results until two months later in November. (Doc. 30 at 12) On December 18, 2018, when his symptoms worsened, Centurion staff prescribed him Pepcid. (Doc. 30 at 14) On December 23, 2018, when his symptoms continued to worsen, Centurion staff directed him to continue taking antacids. (Doc. 30 at 15) On December 24, 2018, when Gamaliel "blacked out" in the prison cafeteria,

10

Centurion staff referred him to a doctor only for a follow-up. (Doc. 30 at 15) Two days later, when Gamaliel collapsed in his cell, Centurion staff did not immediately summon emergency medical services. (Doc. 30 at 15–16) Even though Gamaliel's condition continued to worsen up until his death, Centurion staff refused to provide him constitutionally adequate medical care.

Cineus identifies five other inmates in Florida who received constitutionally deficient care around the same time. (Doc. 30 at 16–18) For example, in 2018, Curtis Dettmann's estate sued Centurion after Dettmann died in a Florida prison while suffering from nausea, vomiting, high blood pressure, fever, elevated white blood cell counts, and low lymphocyte counts. (Doc. 30 at 16) Instead of summoning a doctor or referring Dettmann to an outside medical provider to treat his infection, a nurse who worked for Centurion only prescribed medication. (Doc. 30 at 17) Also, in 2019, Jamal Smith died in a Florida prison while suffering from groin pain. (Doc. 30 at 17) Medical staff ignored Smith's requests for evaluation and treatment, and prison staff accused Smith of feigning illness and placed him in solitary confinement, where he died four days later. (Doc. 30 at 17)

Cineus identifies inmates in prisons in other states who received constitutionally deficient medical care from subsidiaries of Centurion's parent corporation. (Doc. 30 at 4–8) For example, Michael Langston died after suffering a stroke in prison because Centurion of Tennessee refused to refer him to an outside medical provider and instead kept him in the prison infirmary. (Doc. 30 at 5) Adonus Encinias committed suicide after Centurion of New Mexico refused to refer him to an outside medical provider for his severe mental illness. (Doc. 30 at 5) Four hours after Encinias's death, Richard Kosirog, another inmate at the same prison, committed suicide after Centurion of New Mexico had reduced Kosirog's

antipsychotic medication to save money. (Doc. 30 at 5–6) Also, Jerry Sisneros suffered permanent damage to his spine because Centurion of New Mexico refused to refer him to an outside medical provider and instead only prescribed medication. (Doc. 30 at 6)

Also, Cinues identifies an employee who sued Centurion of Florida in 2019 for retaliation after the employee reported to state and federal officials that Centurion engaged in unlawful practices to increase the company's profits, which prevented inmates with Hepatitis C from receiving medical care. (Doc. 30 at 7) She also identifies a shareholder of Centurion's parent company who sued the company in 2020 and alleged in the complaint that subsidiary companies (like Centurion) "have a long history of failing to provide proper healthcare to prison populations." (Doc. 30 at 7) Lastly, she identifies an audit in 2019 requested by the Florida Senate recommending that Florida terminate the contract with Centurion because the "cost-plus system contract" is "the most expensive method of calculation for Centurion's services" and because of "the increased number of inmate deaths, and litigation against [the Department of Corrections] ever since the State's privatization of medical service providers in the [ ] prison system in 2010." (Doc. 30 at 8)

In her complaint, Cineus alleges more than just "threadbare recitals." *Iqbal*, 556 U.S. at 678. She alleges that Centurion had a policy of providing inmates in Florida constitutionally deficient medical care for financial gain. (Doc. 30 at 4, 20–22) To support that conclusion, she does not allege "a single incident of unconstitutional activity." *Craig*, 643 F.3d at 1310. She alleges that Centurion staff repeatedly refused to provide Gamaliel constitutionally adequate medical care, as his condition continued to deteriorate. She further alleges that Centurion staff refused to provide other inmates in Florida constitutionally adequate medical care and alleges other facts that demonstrate that Centurion's policyholders

should have known that Centurion staff provided constitutionally deficient medical care in prisons in Florida.

Accepting, as it must at this early stage in the case, the specific allegations in the complaint as true,  the Court can reasonably infer that Centurion had a "persistent and wide-spread practice" of refusing to provide constitutionally adequate medical care to inmates for financial gain. *Church*, 30 F.3d at 1345. The Eighth Amendment prohibited Centurion from adopting that policy. *Brennan v. Headley*, 807 F. App'x 927, 938 (11th Cir. 2020) (citing *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573–74 (11th Cir. 1985)). Consequently, Centurion's motion (Doc. 32 at 21–24) to dismiss the deliberate indifferent claim under *Monell* liability is **DENIED**. *See also Abbott v. Corizon, LLC*, No. 3:19-cv-642-BJD-MCR, 2020 WL 5423200 at *4–*5 (M.D. Fla. Sept. 10, 2020); *Herr v. Armor Corr. Health Servs., Inc.*, No. 6:19-cv-394-RBD-EJK, 2019 WL 12021672 at *4–*5 (M.D. Fla. Sept. 9, 2019); *Gaines v. Jones*, No. 3:18-cv-1332-BJD-PDB, 2019 WL 1400470 at *14–*17 (M.D. Fla. Mar. 28, 2019).[3]

**Punitive Damages**

In the third amended complaint, Cineus demands punitive damages from Centurion. (Doc. 30 at 27) Centurion argues that Cineus cannot recover damages from Centurion, which contracts with the Department of Corrections, a governmental entity. (Doc. 32 at 24)

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), holds that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." Centurion cites *Moore v. LaSalle Corrs., Inc.*, 429 F. Supp. 3d 285, 289 (W.D. La. 2019), which concluded that "[t]he [U.S.

---

[3] In her response to the motion to dismiss, Cineus does not contend that her complaint alleges that a policymaker at Centurion ratified a subordinate's unconstitutional conduct. (Doc. 33 at 14–17) Consequently, the Court does not address Centurion's argument that the complaint fails to allege ratification. (Doc. 32 at 22–24)

Supreme Court's] reasoning in *City of Newport* easily extends to a private entity which has assumed a traditionally governmental role or function via contract with a governmental entity." However, *Moore v. LaSalle Mgm't Co., LLC*, 41 F.4th 493, 512 (5th Cir. 2022) (bolding added), disagreed with the district court and held that a plaintiff may recover punitive damages from a private contractor:

> To begin, the parties dispute whether the Corporate Defendants are immune from punitive damages under § 1983. The Corporate Defendants concede that private corporations typically are not immune. What they argue, though, is that private prison-management companies are. Why? Because private prison-management companies are "engaged in the performance of acts for the public benefit." The district court agreed with the Corporate Defendants. But we agree with Plaintiffs: **Private companies may be held liable for punitive damages under § 1983 whether they performed acts for the public benefit or not.**

Centurion cites no other authority to support its argument. Other courts which have considered the issue agree with the Fifth Circuit. *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1257–59 (N.D. Okla. 2015); *Segler v. Clark Cty.*, 142 F. Supp. 2d 1264, 1268–69 (D. Nev. 2001). Consequently, Centurion's motion (Doc. 32 at 24) to dismiss the claim for punitive damages is **DENIED**.

**Nurse V. Gonzalez**

In her third amended complaint, Cineus raises a claim against a new defendant, V. Gonzalez. Cineus has not submitted proof that she served the complaint on Gonzalez. Fed. R. Civ. P. 4(c)(1), (l)(1). Rule 4(m), Federal Rules of Civil Procedure, requires service no later than ninety days after the complaint is filed:

> If a defendant is not served within 90 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

> But if the plaintiff shows good cause for the failure, the court
> must extend the time for service for an appropriate period.

Cineus filed her third amended complaint on October 27, 2021 and should have accomplished service no later than January 26, 2022. Therefore, no later than **30 DAYS** from the date of this Order, Cineus must serve the complaint on Gonzalez. If Cineus fails to timely accomplish service without showing good cause to support an extension of time, the Court will dismiss the claim against Gonzalez without prejudice.

Accordingly, it is **ORDERED** that:

1.      Florida Department of Corrections' motion (Doc. 31) to dismiss the third amended complaint is **DENIED**. Centurion of Florida, LLC's motion (Doc. 32) to dismiss the third amended complaint (Doc. 20) is **DENIED**.

2.      No later than **30 DAYS** from the date of this Order, Cineus must either serve the third amended complaint on V. Gonzalez or show good cause to support an extension of time to accomplish service.

**DONE AND ORDERED** in Tampa, Florida on September 23, 2022.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

15